IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

QWEST CORPORATION, a Colorado      )
corporation,                       )
                                   )
                 Plaintiff,        )
                                   )
          v.                       )     Civil No. 01-1005-JE
                                   )
CITY OF PORTLAND, an Oregon        )     OPINION AND ORDER
municipal corporation,             )
                                   )
                 Defendant,        )
                                   )
THE CITY OF ASHLAND, an Oregon     )
municipal corporation; THE CITY    )
OF HAPPY VALLEY, an Oregon         )
municipal corporation; THE CITY    )
OF KEIZER, an Oregon municipal     )
corporation; THE CITY OF           )
NORTH PLAINS, an Oregon municipal  )
corporation; THE CITY OF PENDLETON,)
an Oregon municipal corporation;   )
THE CITY OF REDMOND, an Oregon     )
municipal corporation; THE CITY    )
OF SALEM, an Oregon municipal      )
corporation; THE CITY OF           )
SPRINGFIELD, an Oregon municipal   )
corporation,                       )
                                   )
                 Defendants in     )
    _____Intervention.__)

1 - OPINION AND ORDER

David R. Goodnight
John H. Ridge
Maren R. Norton
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, WA 98101

Brad S. Daniels
Stoel Rives LLP
900 SW. 5th Avenue, Suite 2600
Portland, OR 97204-1268

Alex M. Duarte
Qwest Corporation
421 SW. Oak Street, Suite 810
Portland, OR 97204

     Attorneys for Plaintiff Qwest Corporation

Linda Meng, City Attorney
Benjamin Walters, Senior Deputy City Attorney
Office of City Attorney
1221 SW. 4th Avenue, Suite 430
Portland, OR 97204

Nicholas P. Miller
Joseph Van Eaton
Miller & Van Eaton, PLLC
1155 Connecticut Avenue, N.W. Suite 1000
Washington, D.C. 20036-4306

     Attorneys for Defendant City of Portland

Pamela J. Beery
Paul C. Elsner
Matthew J. Michel
Beery, Elsner & Hammond, LLP
1750 SW. Harbor Way, Suite 380
Portland, OR 97201-7191

     Attorneys for Defendants Cities of Ashland, Happy
     Valley, Keizer, North Plains, Pendleton, Redmond,
     Salem and Springfield

JELDERKS, Magistrate Judge:

    Plaintiff Qwest Corp. provides telecommunications services

2 - OPINION AND ORDER

in Portland, Ashland, and North Plains (the Cities),[1] using the
Cities' public rights of way.  Qwest claims that the
Telecommunications Act of 1996, 47 U.S.C. § 253, preempts
ordinances, charter provisions, and franchise requirements that
govern Qwest's use of the Cities' public rights of way.

This court granted summary judgment for the Cities.  Qwest
Corp. v. City of Portland, 200 F. Supp. 2d 1250 (D. Or. 2002)
(City of Portland I).  The Ninth Circuit affirmed in part,
reversed in part, and remanded for further proceedings.  Qwest
Corp v. City of Portland, 385 F.3d 1236 (9th Cir. 2004) (City of
Portland II), cert. denied, 544 U.S. 1049 (2005).

The parties now move for summary judgment on the remaining
claims.  I grant the Cities' motions for summary judgment and
deny Qwest's motions for summary judgment.

### THE NINTH CIRCUIT'S INSTRUCTIONS ON REMAND

### I.  "Findings"

The Ninth Circuit has instructed this court "to delineate
its findings with regard to each individual city's challenged
franchise requirements."  City of Portland II, 385 F.3d at 1240.
I conclude that by using the word "findings," the Ninth Circuit
meant that this court is to provide more specific legal rulings
on remand.  This court may not resolve disputed issues of fact at

---

[1]    The cities of Eugene, Happy Valley, Keizer, Pendleton,
Redmond, Salem, and Springfield are no longer in the case.

summary judgment, although it may provide a statement of undisputed facts in support of legal rulings.

## II. Preemption Test for § 253(a)

In its opinion, the Ninth Circuit disagreed with this court's reading of § 253(a).  See City of Portland II, 385 F.3d at 1240-41.  Section 253, entitled "Removal of barriers to entry," provides in relevant part:

(a) In general

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

Section 253(a) applies to regulations that either prohibit or may have the effect of prohibiting the ability of any entity

to provide telecommunications services.  See Qwest Communications
Inc. v. City of Berkeley, 433 F.3d 1253, 1256-57 (9th Cir. 2006)
(City of Berkeley).  The court should consider the effect of
challenged requirements separately and in combination.  See City
of Auburn v. Qwest Corp., 260 F.3d 1160, 1176 (9th Cir. 2001)
(City of Auburn).  The telecommunications provider bears the
burden of showing that the challenged regulations violate
§ 253(a).  See New Jersey Payphone Ass'n, Inc. v. Town of West
New York, 130 F. Supp. 2d 631, 636 (D. N.J. 2001), aff'd, 299
F.3d 235 (3d Cir. 2002).

        If the challenged regulations neither prohibit, nor "may
have the effect" of prohibiting, the ability of any entity to
provide a telecommunications service, then § 253 does not preempt
the regulations and the court's inquiry is complete.  If, and
only if, a regulation violates § 253(a), the court then must
determine whether the regulation is rescued by the safe-harbor
provisions of § 253(b) or (c).  See City of Auburn, 260 F.3d at
1177.

        In its briefing, Qwest repeatedly argues that § 253 preempts
all local regulations that are not related to managing the public
rights of way, apparently because Qwest believes that § 253(c)
places substantive limits on the authority of cities.  See, e.g.,
Qwest Mem. in Supp. (Portland) at 1 ("Only those regulations that
are narrowly limited to rights-of-way management are not

5 - OPINION AND ORDER

preempted by section 253."); id. at 5 (§ 253(c) "limits local
governments to rights-of-way management"); Qwest Reply (Portland)
at 3 ("Cities are limited to managing their rights-of-way.");
Qwest Mem. in Supp. (Cities) at 1 (same).  Qwest is incorrect.[2]
See City of Auburn, 260 F.3d at 1177; City of Portland II, 385
F.3d at 1242 n.7; City of Berkeley, 433 F.3d at 1257.  Section
253(c) provides local governments with an affirmative defense.
It "is not an independent substantive prohibition that operates
to limit the City's right to receive compensation for use of its
rights of way."  City of Portland v. Electric Lightwave, Inc.,
Civ. No. 03-538-AS, 2005 WL 4044333, at *17 (D. Or. May 5, 2005)
(ELI).  Contrary to Qwest's assertions, a regulation could be
completely unrelated to managing rights of way but not violate
§ 253(a), so long as the regulation would not have the effect of
prohibiting a telecommunications service.[3]

I assume that because the safe-harbor provisions function as
affirmative defenses, the Cities bear the burden of establishing

_____

[2]  Qwest's argument might fare better in the Sixth Circuit.
See TCG Detroit v. City of Dearborn, 206 F.3d 618, 624 (6th Cir.
2000) (§ 253(c) imposes substantive limits on local regulations);
cf. Puerto Rico Tel. Co. v. Municipality of Guayanilla, 450 F.3d
9, 20 & n.10 (1st Cir. 2006) (noting conflict between the Sixth
Circuit's position and the Eleventh Circuit's holding in
BellSouth Telecomms., Inc. v. Town of Palm Beach, 252 F.3d 1169,
1187, 1191 (11th Cir. 2001) (§ 253(c) functions only as an
affirmative defense)).

[3]  At oral argument, counsel for Qwest conceded that the
analysis for violations of § 253(a) is separate from the safe-
harbor analysis for § 253(c).

that the safe-harbor provisions apply.  See Time Warner Telecom
of Oregon, LLC v. City of Portland, 2006 WL 581135, at *5 (D. Or.
Mar. 8, 2006) (Time Warner) (Ninth Circuit has not determined
whether burden of proof remains with plaintiff regarding the
safe-harbor provisions).

    In City of Portland II, the Ninth Circuit emphasized that a
regulation could violate § 253(a) even if the regulation didn't
actually prohibit and didn't have the effect of actually
prohibiting any telecommunications services.  385 F.3d at 1241.[4]
However, almost any regulation, considered in the abstract
without factual context, could be depicted as potentially
prohibiting a telecommunications service.  A $5.00 application
fee would be prohibitory if the applicant had only $2.00.  Unless
the preemption analysis is somehow connected to reality, a
telecommunications provider could rely on purely hypothetical
scenarios to establish a violation of § 253(a).

    I conclude that a plaintiff challenging a city's
telecommunications franchise provisions must rely on more than
speculation to show a potential prohibitory effect.  See Time

-------------------

    [4]  It is the duty of a trial court to follow the guidance
of appellate opinions regardless of whether it understands the
underlying rationale or logic of those opinions.  Although I
remain unable to grasp the concept that regulations which
historically have not, and currently do not, prevent services
from being provided can be construed as having the effect of
prohibiting those same services, I have done my best in this
opinion to follow the directions of the Circuit.

7 - OPINION AND ORDER

Warner, at *4 ("The court's analysis of a challenged regulation
should not be completely divorced from economic reality."); ELI,
at *11.  A telecommunications provider "must at least demonstrate
that the requirement is or may be a 'barrier to entry' into the
City's telecommunications market."  Id. at *8 (citing City of
Portland II, 385 F.3d at 1241).  See also In re TCI Cablevision
of Oakland County, Inc., 12 F.C.C.R. 21,396, 21,440, 1997 WL
580831, at *36 (F.C.C. 1997) ("Parties seeking preemption of a
local legal requirement . . . must supply us with credible and
probative evidence that the challenged requirement falls within
the proscription of section 253(a) without meeting the
requirements of section 253(b) and/or (c).").

     As an example of a challenge that has little if any basis in
economic reality, I note that Qwest attacks the City of North
Plains's non-refundable registration fee of $35 (or another
amount as set by City Council resolution), and the required
deposit of $2,000 towards the City's expenses in processing the
application.  See Qwest Mem. in Supp. (Cities) at 9.  Any unused
portion of the application fee would be returned to the
applicant.  North Plains Mun. Code, §§ 3.25.030(C),
3.25.045(C)(2).  Qwest presents no evidence that the City of
North Plains has ever demanded an increased registration fee or
sought exorbitant processing expenses.  Practically speaking, it
is difficult to understand how such relatively minuscule expenses

8 - OPINION AND ORDER

could possibly have a prohibitory effect on a business the size of Qwest[5] or, for that matter, on any business that would be capable of providing telecommunications services. While Qwest may not contend that the North Plains fees by themselves are prohibitory, the challenged fees are simply too small to be prohibitory whether considered alone or in combination with other regulations.

## III.  General and Telecommunications-Specific Ordinances

The Ninth Circuit pointed out this court's failure "to draw a distinction between the Cities' ordinances that are telecommunications-specific and those that are not." City of Portland II, 385 F.3d at 1241.  The Ninth Circuit stated that in City of Auburn, "each of the challenged ordinances specifically addressed the provision of telecommunications services and was adopted after the enactment of the FTA in 1996." Id. (footnote and citation omitted).  The Ninth Circuit noted that "an examination of the cases discussing preemption under § 253 reflects that telecommunications-specific ordinances enacted after 1996 are generally the subject of review." Id. at 1241 n.4 (citations omitted).

Turning to this case, the Ninth Circuit stated that "Portland's franchising process is not the result of a single,

_____

[5]  Qwest recently earned $80 million in annual exchange access revenues in Portland city limits. ELI, at *3.

uniform ordinance regulating telecommunications providers.
Rather, the city's franchising process includes a number of
provisions adopted over the course of many years and are
applicable to utilities generally." Id. at 1242.  The court
concluded:

> We doubt whether City of Auburn can be read so broadly
> as to apply to ordinances that are not specific to the
> telecommunications permitting process.  Based on the
> record before us, there is no indication that Portland
> or the other Cities, with the exception of Ashland,
> Eugene, and Springfield, have passed ordinances that
> are specific to the telecommunications process and
> apply to all telecommunications providers attempting to
> enter the market.  Therefore, to the extent that Qwest
> challenges these ordinance provisions, it is
> questionable whether § 253 even applies.

Id. (footnote omitted and emphasis added).

Qwest argues that this court should treat the Ninth
Circuit's distinction between general and telecommunications-
specific regulations as dictum.  Several district courts have so
held.  See, e.g., Pac. Bell Tel. Co. v. Cal. Dep't of Transp.,
365 F. Supp. 2d 1085, 1088 n.2 (N.D. Cal. 2005).  However, this
court cannot just disregard the Ninth Circuit's guidance,
especially when it bears directly on a disputed issue to be
resolved on remand.

The Cities, relying on the Ninth Circuit's expressed doubt,
contend that the generally applicable provisions which Qwest
challenges are not subject to preemption under § 253(a).  In ELI,
Judge Ashmanskas agreed with this argument, concluding that the

court was "bound by [City of Portland II] and therefore must find that the provisions of the [Portland] City Charter, incorporated into Ordinance 170283 [ratifying the franchise agreement], are not preempted by section 253(a) of the FTA." ELI, at *6. Similarly, in Time Warner, Judge Panner concluded that § 253(a) did not apply to Portland City Charter provisions. Time Warner, at *13.

It is not necessary to decide whether ordinances of general application are not preempted, because I conclude for the reasons stated below that none of the generally applicable provisions challenged by Qwest are preempted. It may be possible that generally applicable legal requirements could be enforced in a way that would violate § 253, but Qwest has not made that showing here.

I therefore address whether the generally applicable provisions at issue in this case are preempted. I will also address legal requirements challenged by Qwest for the first time on remand, even though such requirements are at least arguably beyond the scope of the issues this court must resolve.

**STANDARDS**

The court must grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). If the moving party shows that there are no genuine issues of material

11 - OPINION AND ORDER

fact, the nonmoving party must go beyond the pleadings and designate facts showing an issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## PREEMPTION UNDER 47 U.S.C. § 253

### I.  The City of Portland

Qwest operates in Portland under a temporary revocable permit, or TRP, allowing Qwest to use the public rights of way for the provision of telecommunications services.  The Portland City Council approved the current TRP in September 2005, effective until September 30, 2006.

The terms and conditions of Qwest's TRP are substantially similar to the terms of the agreements under which Qwest (and its predecessors Pacific Northwest Bell Telephone and U.S. West Communications) have operated continuously in Portland's public rights of way since 1932.

Qwest is a significant user of Portland's public rights of way.  Between July 2000 and June 2001, Qwest excavated about 192,000 square feet of public streets, installed 114 underground structures, and 185 poles.  Qwest places wires, batteries, generators, conduit banks, and other equipment over, under, and on the public rights of way.  Qwest's installation and repair of its equipment in the public rights of way increase the City's costs in maintaining the streets, disrupt traffic, and interfere with adjoining businesses and residences.

The City of Portland has never rejected an application for a telecommunications franchise.  The City of Portland has never refused to approve a requested transfer of ownership or control of a telecommunications franchise.

As of 2001, the City had granted, or was in the process of granting, more than thirty telecommunications franchises or revocable permits allowing use of the public rights of way.  The City's requirements for utilities, including telecommunications providers, are similar to those contained in Qwest's temporary revocable permit.  The City uses a one-page franchise application to evaluate potential franchisees.

Qwest challenges provisions of the Portland City Code, the City Charter, and the temporary revocable permit.  I first address the challenged terms of the temporary revocable permit, individually and in combination.  I then address the generally applicable provisions of the City Charter and Code.

**A.  Provisions of the Temporary Revocable Permit**

Qwest challenges provisions of its temporary revocable permit with the City of Portland.  As noted above, Qwest and its predecessors have operated under this TRP and similar agreements for many years without suffering any prohibitory effects. However, Qwest's failure to show that the TRP has had even the slightest actual prohibitive effect is not dispositive.  See City of Berkeley, 433 F.3d at 1256.  Nevertheless, Qwest's long

history of operating under the challenged TRP is relevant to the preemption analysis, especially because Qwest bears the burden of showing that the TRP may have a prohibitive effect.  In this litigation, Qwest has not to submitted any evidence of actual prohibitory effects, so its preemption arguments necessarily rely on conjecture regarding how the City might enforce its requirements.  However, the history of the parties' arrangement is relevant when this court evaluates Qwest's challenges to regulations that, for example, authorize penalties for breach of the TRP or require City approval for transfers of franchise rights.

In analyzing the challenged provisions of the TRP, it must be understood that under Oregon law, the TRP is "a mutually binding contract, subject to state law governing contracts, including the duty to operate in good faith."  <u>ELI</u>, at *12 (interpreting ELI's franchise agreement with the City of Portland); <u>Time Warner</u>, at *12 ("Franchise agreements are mutually binding contracts between the City and the franchisee.").  Although Qwest argues that provisions of the TRP give the City "unfettered" or "open-ended" discretion, "[t]he City's discretion in enforcing these provisions is limited by the implied duty of good faith and fair dealing, which Oregon law implies in every contract."  <u>Time Warner</u>, at *12.  The City's discretion is also limited by the requirement that the parties

14 - OPINION AND ORDER

comply with applicable state and federal law.  See id.

 With these general considerations in mind, I turn to Qwest's specific challenges to the provisions of the TRP.

 **Section a.2.C** governs the duration of the TRP, providing that the TRP is effective for either six months from its effective date, or until the City grants Qwest a franchise and the franchise becomes effective.  This provision is not prohibitive.  Qwest has been able to operate under the TRP while litigating its challenges to the TRP.  The City has no obligation to grant Qwest a franchise with an unlimited term.

 **Section a.2.F** provides that to the extent authorized by law, the TRP is subject to the City Charter and the general ordinances.  The provision incorporates by reference sections 10-201 to 10-218 of the Charter.

 As noted above, the City does not have unfettered discretion in enforcing the terms of the TRP.  The City states that the incorporated Charter provisions were adopted to prevent the City from entering into agreements that would improperly contract away the public rights of way.  As I discuss below, the Charter provisions themselves are not prohibitory.

 **Section c.2.C** allows Qwest to deduct payments made to the City from the permit fees due.  The provision excludes the value of any right given to the City by Qwest for the use of poles, conduits, or ducts.  Qwest is also not allowed to deduct the fees

paid to the City for street telephone booths.

Qwest characterizes section c.2.C as an in-kind compensation provision. In-kind compensation requirements may violate § 253(a), depending on the terms of the particular provision. See, e.g., Time Warner at *9-10 (ruling that one franchise agreement's in-kind provision was preempted while another agreement's in-kind provision was not). I agree with the City, however, that this provision does not obligate Qwest to provide in-kind compensation. The provision is not prohibitory because it simply defines and limits the types of deductions allowed.

**Section c.3** requires that Qwest submit a written report on gross revenues when it pays license fees. The Ninth Circuit has upheld the requirement that Qwest pay franchise fees based on a percentage of Qwest's gross revenues. Because the fee requirement is lawful, the City may demand that Qwest verify its gross revenues to ensure that Qwest is paying the correct amount. This reporting requirement is reasonably related to the fee requirement and does not impose an undue burden on Qwest. See ELI, at *9 ("It would be incongruent for the court to find that the fees were permissible under the FTA, but prohibit the City from any accounting for the payment of those fees."). Even if this provision could be said to violate § 253(a), it is saved by § 253(c) because the provision "is in furtherance of permissible compensation for use of the rights of way." Id.

**Section c.4** provides for auditing the franchise fee payments made by Qwest, and authorizes the City to review Qwest's financial records on at least forty-eight hours written notice during normal business hours.  For the same reasons that section c.3 is not prohibitory, this section also passes muster.  The City's authority to review Qwest's financial records is limited by the terms of the provision itself and by Oregon contract law. As Judge Ashmanskas noted regarding a similar auditing provision, "it would be nonsensical for the court to allow the fees under the FTA, but prohibit the City from any accounting for payment of those fees as preempted by the Act." ELI, at *22.

**Section f.1.A** requires that Qwest provide the City with copies of maps one year after the permit is issued, showing the location of facilities in the streets on a scale either agreed to by Qwest or on a scale adopted by the City for general use.  The City requires that utilities maintain maps for safety and planning purposes.

This provision is not prohibitive because the City is entitled to know exactly where utilities have placed their equipment and lines.  The mapping requirement is a necessary corollary to the City's authority over the public rights of way. Even if this provision had a prohibitory effect, it is rescued by the safe-harbor provision of § 253(c) because the mapping requirement is directly related to the City's management of the

17 - OPINION AND ORDER

public rights of way.  Acceptable management activities include
"'keeping track of the various systems using the rights-of-way to
prevent interference between them.'"  City of Berkeley, 433 F.3d
at 1258 (quoting City of Auburn, 260 F.3d at 1177 (further
citation omitted)).

**Section n** requires the City's written consent for any
transfer or assignment of the TRP.  This provision is not
prohibitory because the City's discretion is expressly limited by
the provision itself:  "The City shall not unreasonably delay or
withhold its consent to any such sale, lease, mortgage,
assignment, transfer or merger."  TRP § n.2.  The City's
discretion is also limited by the implied duty of good faith and
fair dealing.  The fact that the City has never denied a transfer
shows that the provision has been applied reasonably.  I conclude
that this provision has no prohibitory effect.  See ELI, at *12-
13 (upholding similar restrictions on transfers).

Even if the transfer provision did run afoul of § 253(a), it
is saved by the safe-harbor provision of § 253(c).  As part of
managing the public rights of way, the City is entitled to ensure
that an assignee or transferee will use the public rights of way
responsibly.  See City of Berkeley, 433 F.3d at 1258 (proper
right-of-way "management activities" include determination of
insurance, bonding, and indemnity requirements).

**Section o** allows the City to revoke the TRP for a "material

18 - OPINION AND ORDER

violation" of the TRP, and to impose penalties, subject to due process and other protections.  Section o allows penalties of up to $1,000 per violation, suspension of Qwest's rights under the TRP, and revocation.  Qwest is entitled to thirty days prior written notice and an opportunity to cure the alleged violation. The City may not enforce this section "if a bona fide, good faith dispute exists between the City and Qwest."

I conclude that this provision is not prohibitory.  This provision "is simply a remedy available to the City" if Qwest "elects not to comply" with the TRP.  ELI, at *14 (analyzing similar provision).  Because cities may require that telecommunications providers obtain franchise agreements for use of the public rights of way, cities must be allowed to enforce the terms of those agreements.  Qwest has not shown Congress intended through § 253(a) to give telecommunications providers a free pass to violate the terms of their franchise agreements with impunity.

**Section q.1.B** requires that Qwest comply with applicable City ordinances and other regulations established under the City's lawful authority.  It is unclear how such a provision could be prohibitory.  It does not violate § 253(a).

**Section q.3** gives the City Council authority "to reasonably regulate the exercise of the privileges permitted by this Permit in the public interest."  The provision states that Qwest "shall

19 – OPINION AND ORDER

not be relieved of its obligations to comply" with the TRP if the City does not promptly seek compliance.  The provision also states that the City does not waive its rights under the TRP if the City fails to seek compliance promptly.

This provision is a permissible exercise of the City's authority to require franchise agreements.  The City Council's discretion is limited by the duty of good faith and fair dealing, as well as the requirement to comply with state and federal law. I conclude that this provision is not prohibitory.

**Section r** requires that within ten days of the TRP becoming effective, Qwest must file a written acceptance of the ordinance adopting the TRP.  Failure to file a timely written acceptance would be deemed an abandonment of Qwest's rights and privileges under the TRP.

Qwest has been able to comply with this provision each time the TRP has been renewed.  There is no indication that the provision has any prohibitory effect.  See ELI, at *15 (upholding provision requiring written acceptance).  Qwest has also been able to reserve its rights to challenge the terms of the TRP, as it is now doing in this litigation.

I conclude that none of the challenged provisions of the TRP individually have a prohibitory effect.  I also conclude that taken together, there is no prohibitory effect caused by the TRP as a whole.  In reaching that conclusion, I have taken into

20 - OPINION AND ORDER

account Qwest's ability to operate under the terms of the TRP. Regardless of Qwest's history, however, I would reach the same conclusion because Qwest has failed to show that the TRP as a whole may have a prohibitory effect on the provision of any telecommunications service.

**B.  Generally Applicable Provisions**

**1.  City Charter Provisions**

**Section 10-105** of the Charter, entitled Supervision and Regulation, reserves the City Council's authority to supervise and regulate all public utilities in the City.

This provision is a reservation of the City's rights.  State and federal laws now limit the City's authority to regulate utilities.  This provision does not impose any burden on Qwest. I conclude that it has no prohibitory effect.

**Section 10-106** of the Charter, Investigations and Rate Fixing, reserves the City's authority to investigate public utilities and to regulate public utility rates.  The City acknowledges that under current federal and state law, it has no power to regulate Qwest's rates.  This provision, another reservation of rights, has no prohibitory effect.

**Section 10-107** of the Charter requires that public utilities provide quarterly reports, authorizes inspections of records, and requires maintenance of books in accordance with state and federal regulations.  According to the City, Qwest's quarterly

reports are about twenty lines long.

Because the City is entitled to collect fees for use of the rights of way, the City may require Qwest to provide information showing that Qwest is paying the correct amount of fees. Qwest has not shown that providing the required reports is so onerous as to create a potential prohibition.

**Section 10-108** of the Charter grants the City Council the power to adopt "necessary or appropriate" regulations, and to impose penalties and forfeitures for violations. Regulations are subject to review by the courts.

Because regulations are subject to judicial review, and because the City's authority is limited by state and federal law, this generally applicable provision does not run afoul of § 253(a). If the City did pass a regulation or impose a penalty that overstepped its limited power, Qwest could refuse to comply with the offending regulation or penalty and seek review in court.

**Section 10-207** of the Charter, Method of Granting, sets the process for adopting franchises. Each franchise must be embodied in an ordinance. The franchise application must be published in a daily newspaper.

Qwest characterizes this section as giving the City "unfettered discretionary power to grant or deny access to its rights-of-way." Qwest Mem. in Supp. (Portland) at 10. However,

that ignores the limits on the City's discretion imposed by Oregon law and by the TRP itself. Looking to the history of this section, it has had no prohibitory effect on Qwest or any other telecommunications provider: The City has not denied a single franchise applicant. If the preemption test is to have any connection to reality, this court must consider that history as relevant evidence of the regulation's effect. The City notes that it allows applicants to operate under temporary revocable permits so that a telecommunications provider may enter the Portland market while the franchise process is pending.

**Section 10-209(b)** of the Charter requires that the franchise fee be made public, and allows the City to "declare what will be a reasonable reduction of fares, rates or charges" in lieu of cash to be paid by the franchisee for the franchise.

Qwest contends that this provision impermissibly allows the City to require "in-kind" benefits from it. As noted above, courts in this district have determined that open-ended in-kind provisions may run afoul of § 253(a). See, e.g., Time Warner, at *9-10; ELI, at *11; cf. Time Warner at *10 (§ 253 did not preempt a limited in-kind provision).

The City contends that Qwest lacks standing to challenge this provision because it does not impose any obligation on Qwest. I will assume that Qwest has standing to challenge this provision. The challenge fails, however, because it is based on

speculation.  As the City notes, the temporary revocable permit does not require that Qwest make in-kind contributions.  Qwest currently pays the maximum rate on gross revenues allowed by state law (7%), so in-kind contributions would necessarily reduce the amount of cash compensation that Qwest would be obligated to pay.

**Section 10-210(d)** of the Charter provides that the City will not grant a franchise without fair compensation, "either by way of direct payment or by reduction of rates, fares or charges." Section 10-210(d) also authorizes the City to require that a franchisee pay a revenue-based right of way fee in addition to other forms of compensation for the franchise.

As with section 10-210(b), there is no indication that this provision would prohibit Qwest from providing telecommunications services.  The City has the power to require fees in return for allowing use of its rights of way.

**Section 10-210(e)** of the Charter provides that "every franchise and all things constructed thereunder or used in connection therewith, other than rolling stock and power, shall be subject to common use by any person or corporation . . . upon payment or tender of fair compensation for such use."

This provision requires that the provider act as a common carrier.  Because telecommunications services are common carrier services, the provision is not preempted.

**Section 10-211** of the Charter provides that a franchise may contain conditions in addition to those specified by the Charter, as proper to protect the public welfare.  This provision does not require anything from the franchisee.  The City's authority under this provision is limited by state and federal law.

**Section 10-212** of the Charter requires that a franchisee file a written acceptance of the franchise within thirty days after ordinance granting the franchise is effective.  Failure to file a written acceptance is deemed an abandonment of the franchise.

I see no undue burden imposed by this requirement.  See <u>ELI</u>, at *15 (upholding similar requirement).

**Section 10-213** of the Charter requires that the holder of a franchise file a full and correct statement of the franchise. Failure to file the statement could result in a fine of $10 to $100 per day.  If the franchise holder sells, transfers, mortgages, or leases the franchise, within sixty days the grantee must file a copy of the deed, mortgage, lease, or other written instrument.

This provision aids the City in enforcing the terms of a franchise agreement.  It is a reasonable exercise of that authority, and does not impose an undue burden on Qwest.  Qwest has failed to show any prohibitory effect.

**Section 10-214** of the Charter requires that the "City

officer responsible for accounting" keep separate records for each grantee of a franchise.  Grantees and franchise holders are required to furnish the information on request at their cost.  If a grantee or franchise holder fails to furnish the requested information, the City may present a petition to a state court seeking to compel the information.  A fine of $25 to $500 per offense may be imposed.

I conclude that these requirements are reasonable in light of the City's undisputed authority to require franchise fees. There is no prohibitory effect.

**Section 10-215** of the Charter provides that a franchise holder's abandonment or failure to comply with the franchise does not release the franchise holder from its obligations without the City's consent, expressed through an ordinance.  The City may also by ordinance declare a forfeiture, and require the franchise holder either to remove its property from the streets or to pay the cost of removal.

This provision is a reasonable exercise of the City's authority to require that utilities using the public rights of way operate under a franchise agreement with the City.  The City's discretion is limited by the implied duty of good faith and fair dealing.

**Section 10-216** of the Charter prohibits leasing, assigning, selling, or transferring franchise privileges without the consent

26 – OPINION AND ORDER

of the City.

For the same reasons that the similar provision in the TRP is permissible, I conclude that this provision also has no prohibitory effect. The provision does not impose any onerous requirements on a franchisee seeking to sell or otherwise transfer its franchise rights. History shows that the City has never denied a requested transfer. As noted above, the City is entitled to ensure that franchisees using the public rights of way are financially responsible and can fulfill the obligations of the franchise agreement.

### 2. City Code Provisions

Qwest challenges provisions of the City Code.

#### a. Record-Keeping Provisions

Most of the City Code provisions challenged by Qwest concern record-keeping requirements. These Code provisions are reasonably related to the City's authority to collect fees based on gross revenues. The City is not required to accept a franchisee's assertions that it has paid the full amount due. These record-keeping provisions in combination do not impose an undue burden on Qwest.

**Section 7.12.010** requires that the City Auditor keep detailed financial records for each franchisee. The records must be open for public examination during business hours at the Auditor's Office. Grantees and franchise holders must furnish

27 - OPINION AND ORDER

this information to the Auditor on request and at their expense. If the grantee or franchise holder fails to furnish information on request, the City Attorney must petition a state trial court to compel the information.

The financial information required is the type of information a business like Qwest would keep as a matter of course. The City is entitled to determine whether Qwest is paying the full amount due the City.

**Section 7.12.020** of the Code requires that a person or corporation operating a public utility must keep full and correct books and accounts and make written quarterly reports on assets, debts, costs, and profits, in accordance with section 10-107 of the Charter. According to the City, it requires only a one-page report. There is no prohibitory effect.

**Section 7.12.030** authorizes the Bureau of Licenses to inspect at all reasonable hours the financial records of a franchise grantee. The financial records and reports must be in accordance with the forms and methods prescribed by the Bureau of Licenses.

This provision does not impose an undue burden on Qwest. The City is entitled to verify Qwest's financial information.

**Section 7.12.050** governs the contents of a franchise, requiring that the names of all members of the partnership or association be kept publicly available on file with the Auditor.

28 - OPINION AND ORDER

The franchise must set the minimum service to be rendered to the public, and terms as determined by the City Council in addition to those required by the Charter and ordinance.

This provision directly relates to the City's authority to require that utilities obtain a franchise agreement.

**Section 7.12.080** requires that utilities subject to the privilege tax must file quarterly audited statements of revenues earned within the City.

This is not an onerous requirement.  It is in furtherance of the City's authority to collect fees based on a utility's gross revenues.

**Section 7.12.210** requires that public utilities file an annual report.  The required annual report may be a copy of a report already required by the Oregon Public Utilities Commission, the Interstate Commerce Commission, or the Federal Communications Commission.

This requirement does not impose an undue burden on Qwest. Qwest can use copies of reports that it is already required to file with the state and federal governments.

**Section 7.12.220** provides that franchisees must carry on their books a depreciation account, if the State Public Utilities Commissioner has determined that such an account may reasonably be required.

Qwest's challenge to this provision is academic because the

29 - OPINION AND ORDER

City has no authority to regulate Qwest's rates.  The regulation therefore imposes no burden on Qwest.

The following three reporting provisions of the City Code are not objectionable because they further the City's lawful authority to collect fees based on gross revenues.  There is no undue burden imposed on Qwest.

Section 7.14.060 requires that the franchisee file a report of gross revenues, giving the revenues and deductions claimed.

Section 7.12.080 requires that utilities subject to a privilege tax file quarterly privilege tax reports.

Section 7.14.060 requires that when a licensee pays its license fee, it must provide a report of the gross revenues.  The City may investigate the gross revenue report to determine its accuracy, and the licensee must make its records and books available to verify the accuracy of the gross revenue report.

### b.  Penalty Provisions

Section 7.12.200 provides that a person who fails to file required quarterly earnings reports is subject to penalties.

The City is entitled to require the reports, so it may also legitimately impose sanctions for failing to file reports.

Section 7.14.080 provides that if a licensee fails to pay a remainder of a fee within ten days of a determination that the fee payment was deficient, the Commissioner of Public Utilities may suspend the license.  The provision also sets the license fee

30 - OPINION AND ORDER

for those public utilities operating either without a license or while a license is suspended.

This is a permissible requirement based on the City's authority to require the payment of fees for use of the public rights of way.  There is no evidence that the City has ever abused its authority to impose sanctions.

### c.  Other Code Provisions

**Section 7.12.100,** entitled No Waiver or Estoppel, provides that the provisions of the Code or of the ordinance granting a franchise cannot estop the City from requiring a utility to cease using the rights of way on the expiration of the franchise or right to use or occupy the rights of way.

This provision is not prohibitory because it imposes no burden on Qwest.  The provision is intended to ensure that the City will not lose rights through waiver or estoppel.

**Section 7.14.050** provides that a franchisee may deduct from the license fee the amount of payments made or accrued to the City for the period on which the license fee is computed.  The franchisee may not deduct the value of any right given to the City to use poles, conduits, or ducts to other facilities.

This requirement is a permissible exercise of the City's authority to impose a fee on gross revenues.  There is no prohibitory effect.

**Section 7.12.220** sets depreciation standards for any utility

31 - OPINION AND ORDER

whose rates are set by the City of Portland.  Because the City of Portland has no authority to set Qwest's rates, this provision does not impose any burden on Qwest.

### C.  Conclusion

Qwest has failed to meet its burden of showing that the challenged provisions of the TRP, the City Charter, or the City Code, considered separately or in combination, prohibit or "may have the effect of" prohibiting the provision of any telecommunications service.  The City of Portland is entitled to summary judgment on all of Qwest's remaining claims against it.

## II.  The City of North Plains

In North Plains, Qwest operates under a franchise agreement. Although the franchise agreement, which had a term of twenty years, expired in December 2005, Qwest has not requested a renewal of the agreement.  The City of North Plains allows Qwest to continue operating in its rights of way while this litigation is pending.

When Qwest seeks to perform any work in the City's rights of way, it fills out a one-page permit application and submits a one-page hand-drawn map of the proposed work.  See Otterman Aff. at 3 & Ex. 6.  Because of the franchise agreement, Qwest is not required to pay the $150 fee to obtain a right-of-way permit or the refundable deposit of $500.

Qwest challenges provisions of its franchise agreement, the

32 - OPINION AND ORDER

City Charter, and the City Code.  The same general guidelines noted in the City of Portland discussion also apply here, including the implied duty of good faith and fair dealing limiting the City's discretion, and the relevance of the history of Qwest's dealings with the City.

**A.  Challenged Provisions of the Franchise Agreement**

The franchise agreement was enacted by Ordinance 157, which was later amended by Ordinances 189 and 191.

**Section 1** of the agreement provides that Qwest's predecessor, Pacific Northwest Bell Telephone Co., is granted the right to use the public rights of way for telecommunications purposes.  **Section 7** provides that the agreement will be effective for twenty years from the date the ordinance is effective.

Qwest apparently challenges these provisions because they require renewal of the franchise agreement.  See Qwest Mem. in Supp. (Cities) at 6 & n.17.  Local governments are not required to grant unlimited terms for franchisees.  These provisions are not preempted.

**Section 9** provides that the ordinance will be effective thirty days after its passage, and requires that the grantee (Qwest) file its written acceptance of all terms and conditions of the ordinance within thirty days.

This provision has no prohibitory effect.  See ELI, at *15

(upholding provision requiring written acceptance).  As with a similar requirement in the TRP with the City of Portland, Qwest has been able to reserve its rights to challenge the terms of the franchise agreement in this litigation.

**Section 1 of Ordinance 189**, adopted in May 1990, amends the franchise agreement by raising the annual fee on gross revenues (as defined) from 3% to 3.7%.

**Section 5 of Ordinance 191**, adopted in July 1990, amends the franchise agreement by raising the annual fee on gross revenues to 4%.  Because the fee provisions are no longer at issue in this litigation, these provisions are not preempted.

**Section 6** of the agreement provides that the City must deduct from payments due from Qwest the reasonable value of any utility service or use of any of Qwest's facilities or reserved for use by the City without Qwest's prescribed charges.

Qwest characterizes this as a forbidden in-kind compensation provision.  However, unlike in-kind provisions found preempted by other courts in this district, this provision doesn't require that Qwest make in-kind payments.  Cf. Time Warner, at *9-10; ELI, at *11.  Here, as Qwest notes, "Qwest's franchise agreement with North Plains includes no express one-time requirement for in-kind compensation."  Qwest Mem. in Supp. (Cities) at 19. Section 6 provides only that if in-kind payments are made, the reasonable value of such payments must be deducted from the

payments owing to the City.  Because this provision imposes no
burden on Qwest to provide in-kind compensation, the provision
has no prohibitory effect.

**B.  Challenged Provisions of the City Charter and Code**

   **1.  Most-Favored Rate**

The City of North Plains requires that carriers offer the
City the "most favorable rate at the time of the request charged
to similar users within Oregon for a similar volume of service."
North Plains Mun. Code § 3.25.050(D).  In <u>ELI</u> and <u>Time Warner</u>,
most-favored rate clauses were found to be preempted.  <u>ELI</u>, at
*9; <u>Time Warner</u>, at *12.  The challenged most-favored rate
provisions there were found to give the cities too much leeway
because there were no limits on the amount of services the cities
could demand.  <u>See</u> <u>id.</u>

Here, however, the City's discretion is limited.  The City
recognizes that Qwest's charges are subject to state tariffs and
price lists, and allows Qwest to deduct from franchise fee
payments the difference between its best rate and the rate that
would otherwise apply.  The City also allows Qwest to reach a
separate agreement on the terms and rates of service to the City.
These limits distinguish the most-favored rate provision at issue
here from those provisions that were ruled preempted in <u>ELI</u> and
<u>Time Warner</u>.  I conclude that this most-favored rate provision
does not have a prohibitory effect and is therefore not

preempted.

### 2.  Penalty Provisions

Qwest challenges Code provisions authorizing the City to impose fines of $100 to $1,000 for each violation of the Code. <u>See</u> North Plains Mun. Code § 3.25.055(E).  The person must be "found guilty of violating, disobeying, omitting, neglecting or refusing to comply." <u>Id.</u>  I conclude that the penalty provision is an appropriate component of the City's authority to require a franchise.  As noted, § 253 does not authorize telecommunications providers to violate a City's lawful requirements with impunity. The penalty provision is not preempted.

### 3.  Transfer Restrictions

Qwest challenges the City's requirements regarding transfers of the franchise.  <u>See</u> North Plains Mun. Code § 3.25.045(M).  The City must consent to any transfer, sale, lease, merger, or consolidation, but the City may not unreasonably withhold or deny consent.  For the reasons that the analogous City of Portland's transfer requirements are not preempted, the challenged requirements here are not preempted.

### 4.  Application Fees

North Plains requires a registration fee of $35 and a refundable deposit of $2,000 towards processing expenses.  Such fees could not possibly have the effect of prohibiting Qwest from providing telecommunications services.  To rule otherwise would

36 – OPINION AND ORDER

be to ignore economic reality.

### 5.   Franchise Application Process

Qwest challenges the City's franchise application process. See North Plains Code §§ 3.25.45(B)(2)-(6).  The City requires, as is permitted under City of Auburn, that a telecommunications provider apply for a franchise if it wishes to use a city's public rights of way.  See ELI, at *5 (citing City of Auburn, 260 F.3d at 1176 n.11 (preemption not based on "the mere franchise requirement, or the possibility of denial alone")).  North Plains requires that a provider seeking to operate in the rights of way must register and file an application with the City; describe services to be provided; submit plans and network maps; show the area to be served and anticipated future scope; and demonstrate that the necessary permits and licenses for construction, operation, and service have been obtained.  If the City denies an application, it must give its reasons in writing.

The application requirements are logical extensions of the City's authority to require a franchise agreement.  Qwest has not shown an undue burden as these requirements are not onerous. Even if the provisions violated § 253(a), the provisions are saved by § 253(c) because they specifically relate to the City's ability to manage its own rights of way.

### 6.   Renewal

Qwest challenges the City's renewal provisions, contending

37 - OPINION AND ORDER

that they give the City unfettered discretion to deny a franchise.  See North Plains Mun. Code §§ 3.25.045(D), (J); 3.25.045(K)(1), (2), (4)-(6); 3.25.045(L).

These provisions require that the franchisee seeking renewal update the information it provided in its initial application. Because the initial application requirements are not burdensome, it follows that the renewal requirements are also not burdensome. The City's discretion is limited by the requirement to put its determination in writing, providing the reasons for denial or non-renewal.  The provisions specify the permissible reasons for denying renewal, including the applicant's financial, technical, and legal ability; the capacity of the rights of way to accommodate the applicant's facilities (a requirement not challenged by Qwest); applicable federal, state, and local requirements; the applicant's compliance with the City Code and the franchise agreement; and other factors "as may demonstrate that the continued grant to use the public rights of way will serve the community interest."  Id. § 3.25.045(K).

Qwest attacks the "community interest" provision, but it is only one of six possible reasons for non-renewal.  I conclude that the renewal provisions are not preempted.

### 7.  Revocation Provisions

Qwest challenges the City's requirements on revocation of a franchise.  The City may revoke a franchise for specified

reasons, including construction or operation in the City or in public rights of way without a construction permit; construction or operation at an unauthorized application; failure to comply with requirements for sale, transfer, or assignment of a telecommunications system or franchise; misrepresentation in any application to the City; failure to relocate or remove facilities as required by the City Code; and violation of "material terms" of the Code or of the franchise agreement. Id. § 3.25.045(N) (omitting provisions not challenged by Qwest).

The City's discretion to revoke is not unfettered. The decision must be based on specific reasons, which the franchisee may challenge. Even if the revocation provisions violated § 253(a), the provisions are related to the management of the public rights of way and so are rescued by § 253(c). The revocation provisions are not preempted.

### 8. Construction Permits

Qwest challenges the City's requirements for obtaining construction permits. North Plains Mun. Code § 3.25.035(H). Qwest contends that the challenged requirements are impermissible for the same reason that the construction permit requirement was found to be preempted in City of Berkeley.

I agree with the City that the construction permit requirement struck down in City of Berkeley was much more burdensome than the requirement here. The City of Berkeley would

not issue a construction permit unless the applicant met prohibitive franchise application requirements.  <u>See</u> 453 F.3d at 1259.  Here, the application requirements for North Plains are not prohibitive.

I conclude that the construction permit regulations are not preempted.  The regulations require that the City issue a construction permit "subject to such further conditions, restrictions or regulations affecting the time, place and manner of performing the work as they may deem necessary or appropriate."  North Plains Mun. Code § 3.25.045(H).  The City's discretion is not unfettered.

### 9.  Geographic Scope of the Franchise

Qwest contends that the Code gives the City too much discretion in limiting a franchise to a specific area of the City.  North Plains Mun. Code § 3.25.045(G).  Qwest speculates that the City could require a telecommunications provider to apply for a new franchise, and collect the $35 franchise application fee, for each five-mile region.  Qwest contends that "it is wholly unnecessary" for the City to require a new application when a franchisee seeks to provide telecommunications services to a different region of the City.

Qwest has not shown that the City has too much discretion in determining the territory of a franchise.  The applicant seeking to expand its territory is required only to update its existing

40 - OPINION AND ORDER

application.  The City is limited by state regulations that govern Qwest's territory as an incumbent local exchange access carrier.  Cities' Resp. at 25 & n.20.  Even if the provision violated § 253(a), it would be saved by § 253(c) because it relates to the City's authority to regulate its rights of way.

### 10.  Removal or Relocation of Facilities

Qwest contends that the City's regulations governing the removal or relocation of a franchisee's facilities give the City too much discretion.  North Plains Mun. Code §§ 3.25.040(C)(2)-(3).  The Code provision requires that the franchisee, within 90 days of written notice from the City, relocate or remove facilities when the City determines that removal is "reasonably necessary" for construction, repairs, or maintenance; the operations of the City or another governmental entity in the rights of way; and the public interest.  These conditions limit the City's authority to require relocation or removal of facilities.  There is no prohibitory effect.  See City of Auburn, 260 F.3d at 1168, 1169-70 (upholding relocation requirement).

### 11.  Duty to Provide Information

Qwest challenges a Code provision requiring that franchisees allow the City to inspect their records "at reasonable times and intervals."  North Plains Code § 3.25.050(C).  The inspections are allowed for the City to determine compliance with the City Code, or facilities in the rights of way.  Id.  The City states

that Oregon law allows franchisees to submit documents in confidence, and allows the City to keep documents confidential to protect franchisees' proprietary information or trade secrets. Cities' Resp. at 26 (citing Or. Rev. Stat. §§ 192.501(2), 192.502(4)).

Because the provision limits the type of information that may be sought, I conclude that it does not violate § 253(a).

### C. Conclusion

After considering the cumulative effect of the challenged provisions, I conclude that Qwest has failed to meet its burden of showing that the regulatory scheme for the City of North Plains is preempted. Qwest has not shown that the requirements are so burdensome as to violate § 253, unlike the regulations struck down in City of Auburn and City of Berkeley.

## III. The City of Ashland

In Ashland, Qwest operates under a franchise agreement granted in February 2000. The City agreed to exempt Qwest from provisions of the Ashland Municipal Code, including those governing construction permit fees, bonds, and insurance. Franell Aff. at 6.

The franchise agreement expired in September 2003. However, the City of Ashland, like the City of North Plains, allows Qwest to operate in its rights of way without an agreement while this litigation is pending.

Qwest's telecommunications facilities are in almost every right of way in Ashland, including more than 90 miles of streets. Qwest pays no fees to the City for permits to work in the right of way.  Qwest did not pay an application fee for the now expired franchise.

## A.  Application Process

Qwest challenges the City's application process, contending that the process is overly burdensome.  Qwest complains that an applicant must describe the telecommunications services offered, Ashland Mun. Code (AMC) §§ 16.20.030(B), (M); submit engineering plans and a map of proposed facilities, AMC § 16.20.030(C); provide an accurate map of existing telecommunications facilities the applicant intends to use, AMC § 16.20.030(L); show that it has obtained all other governmental approvals and permits to construct and operate facilities, AMC § 16.20.030(J); provide financial statements and information regarding financial, technical, and legal abilities to provide telecommunications services, AMC §§ 16.20.030(H), 16.20.030(I); describe access and line-extension policies, AMC § 16.20.030(O); and disclose whether the applicant intends to provide cable or video service, AMC § 16.20.030(K).

The City of Ashland did not require Qwest to follow the application procedures in AMC § 16.20.030 when Qwest obtained its franchise in 2000.  Franell Aff. at 3.  Assuming that Qwest has

43 - OPINION AND ORDER

standing to challenge the application procedure, I conclude that
it is not prohibitory.  Each requirement is related to legitimate
concerns of the City regarding an applicant's ability to provide
telecommunications services and to use the rights of way
responsibly.

Qwest challenges the City's process for deciding whether to
grant an application.  AMC § 16.20.050.  The City must issue a
written determination granting or denying an application in whole
or part, and must give its reasons for a denial.  The City must
consider several factors, including the applicant's financial,
legal, and technical ability; the public interest in minimizing
the cost and disruption caused by construction in the rights of
way; the service provided to the community and region; the
effect, if any, on public health, safety, and welfare if the
franchise is granted; applicable federal and state laws; and
other factors showing that the grant to use the rights of way
will serve the community interest.  Id.

These requirements are specific enough to limit the City's
discretion in granting or denying a franchise application.  The
requirements would not have the effect of prohibiting the
provision of any telecommunications service.

Qwest challenges the City's application and review fee.  AMC
§ 16.20.040.  However, this provision specifically exempts "a
telecommunications utility which provides only local exchange

access."  Id.  Because Qwest fits the exemption, I will not

address this provision.  See Qwest Corp. v. City of Surprise, 434

F.3d 1176, 1180 (9th Cir. 2006) ("Qwest suffers no injury when

its competitors are subjected to additional, costly

requirements").

### B.  Renewal Process

Qwest challenges the City's process for renewing a

franchise.  AMC § 16.20.130.  The factors governing the renewal

process are similar to the factors considered in deciding whether

to grant a franchise initially.

Qwest also challenges the requirement that a franchise

holder cure any defaults before renewal of the franchise.  AMC §

16.20.140.  The City may require that a franchisee cure

violations of the franchise agreement before the City renews the

franchise.  If the franchise holder has not cured the violations,

it may submit a plan to the City "detailing the corrective action

to be taken."

The renewal process is not overly burdensome.  The City may

legitimately require that a franchise holder cure any violations

before allowing a renewal of the franchise.

### C.  Revocation Procedures

Qwest challenges the City's regulation on revoking a

franchise.  AMC § 16.20.170.  The regulation specifies that a

franchise may be revoked for constructing or operating in the

45 - OPINION AND ORDER

City or public rights of way without authorization; unauthorized
substantial transfer of control of the grantee; failure to comply
with requirements regarding sale, transfer, or assignment of a
telecommunications system or franchise; misrepresentation by a
grantee in any application to the City; failure to relocate or
remove facilities if required; or violating a material provision
of the City Code or the franchise agreement.

If the City believes that there are grounds for revoking a
franchise, the City "shall give the grantee written notice of the
apparent violation or noncompliance, providing a short and
concise statement of the nature and general facts of the
violation or noncompliance."  AMC § 16.20.180.  The City must
give the grantee "a reasonable period of time not exceeding 30
days to furnish evidence" that the grantee has or is taking
corrective action; that rebuts the alleged violation or
noncompliance; or that it would be in the public interest to
impose a sanction less than revocation.  Id.  If the grantee
fails to produce evidence "reasonably satisfactory to the city,"
the alleged violation is referred to the City Council, which must
give the grantee notice and a reasonable opportunity to be heard.
AMC § 16.20.190.

The Code provides standards for the City Council to apply in
determining the proper sanction for violations.  AMC § 16.20.200.
These standards include whether the misconduct was egregious;

46 - OPINION AND ORDER

whether it caused substantial harm; whether it was intentional; whether there is a history of violations of the same or other requirements; whether there is a history of overall compliance; and whether the grantee voluntarily disclosed, admitted, or cured the violation.

The City must have the power to revoke a franchise as part of its power to grant a franchise. The City's discretion is sufficiently limited by the terms of the Code, which provide due process to the grantee and specify the permissible grounds for revocation.

### D.  Duty to Provide Information

Qwest challenges a requirement that a grantee provide information showing compliance with the Code. AMC § 16.24.030. The City must give the grantee ten days written notice. The grantee also must make available for inspection "at reasonable times and intervals" the grantee's books, maps, and records "maintained by the grantee with respect to its facilities within the public rights of way." Id.

This requirement does not impose an undue burden on franchisees. The City is entitled to ensure compliance with the franchise agreement and the City Code. The requirement provides that City's discretion to inspect books is exercised reasonably.

### E.  Penalties

Qwest challenges the City's penalty provision, which states

47 - OPINION AND ORDER

that "[a]ny person found guilty of violating, disobeying, omitting, neglecting or refusing to comply with any of the provisions of this title" will be fined not less than $500 for each offense. AMC § 16.28.050. A separate offense is deemed to be committed on each day that a violation occurs.

The City is entitled to impose sanctions for violations of its Code. This provision is not prohibitory.

### F. Construction Permits and Standards

Qwest attacks the City's regulations governing construction permits. AMC § 16.12.080 (issuance of permit). For the reasons that the construction permit provisions of the City of North Plains are not preempted, this provision is also not preempted.

Qwest also challenges the City's requirements for construction. AMC §§ 16.12.030, 16.12.030(A). These provisions require that telecommunications facilities be constructed and operated in accordance with federal, state, and local codes and regulations, including the National Electrical Code. They also require that a person constructing a telecommunications facility in the public rights of way must obtain a construction permit and pay the construction permit fee, and that a provider must first have a franchise before a construction permit is issue.

Qwest characterizes these provisions as overly burdensome. However, the requirement that the telecommunications provider have a franchise excepts franchises that are under negotiation.

48 - OPINION AND ORDER

In fact, Qwest has been allowed to obtain permits and occupy public rights of way after its franchise expired.  Franell Aff., at 6.

### G.  Relocation and Removal

Qwest challenges the City's regulations governing the relocation and removal of facilities from the public rights of way.  AMC §§ 16.16.020, .030, .040.  Qwest contends that these provisions give the City unfettered discretion.

These requirements are permissible as part of the City's authority to manage its rights of way.  As I noted above regarding similar provisions in the North Plains Code, utilities traditionally bear the cost of relocating.  See City of Auburn, 260 F.3d at 1168, 1169-70.  There is no evidence that the City has ever abused its authority to manage its rights of way.

### H.  Other Provisions

Qwest challenges a provision stating that a franchise is subject to the Constitution and laws of the United States, the State of Oregon, and the ordinances and charter of the City.  AMC § 16.28.010.  I see no reason why this provision would be prohibitory.

Qwest challenges paragraph 14 of its franchise agreement, which states that Qwest does not waive its rights to challenge the legality and enforceability of the City Code provisions on franchises.  I am unsure why this paragraph is objectionable, and

49 - OPINION AND ORDER

do not find it prohibitory.

### I. Conclusion

I conclude that cumulatively, the challenged requirements imposed by the City of Ashland are not prohibitory.  The requirements are a permissible exercise of the City's authority to require franchise agreements and to manage the public rights of way.

### OTHER ISSUES

Qwest has pleaded claims under 42 U.S.C. § 1983.  I conclude that § 253 does not create a private right of action under § 1983.  See Time Warner, at *13-14 (relying on Qwest v. City of Santa Fe, 380 F.3d 1258, 1265-67 (10th Cir. 2004)).

Because of my rulings on the merits of the preemption arguments, it is unnecessary to address the issue preclusion defense raised by Ashland and North Plains.

The intervening cities of Happy Valley, Keizer, Pendleton, Redmond, Salem, and Springfield have been voluntarily dismissed.  These cities now seek declaratory relief.  I agree with Qwest that as to these dismissed parties, this action is over.  Declaratory relief is not appropriate under these circumstances.  See Olagues v. Russoniello, 770 F.2d 791, 803 (9th Cir. 1985) ("The decision whether to grant declaratory relief is within the sound discretion of the district court.").

**CONCLUSION**

The Cities' motions for summary judgment (##378, 384) are granted.  Qwest's motions for summary judgment (##370, 387) are denied.

DATED this 15th day of September, 2006.


        /s/ John Jelderks
John Jelderks
U.S. Magistrate Judge